In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-3179

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MILLARD WILLIAMS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cr-00149-1 — **Sharon Johnson Coleman**, *Judge.*

———————————

ARGUED APRIL 16, 2024 — DECIDED JULY 2, 2024

———————————

Before ST. EVE, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Over the phone and while inside a Georgia jail, Millard Williams orchestrated the shipment of a mysterious package to an address in Chicago. Law enforcement intercepted the package. It contained furanyl fentanyl, a Schedule I controlled substance.

A jury later found Williams guilty of (among other things) conspiring to possess and possessing at least 100 grams of furanyl fentanyl. It also determined that furanyl fentanyl is an "analogue of fentanyl," triggering a ten-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(vi).

This appeal primarily asks us to consider whether furanyl fentanyl is in fact an "analogue of fentanyl" for purposes of § 841(b)(1)(A)(vi)'s penalty provision. Williams says it is not, arguing that we should look to the definition of the term "controlled substance analogue" elsewhere in the statute. That definition excludes already-scheduled substances. So, because furanyl fentanyl is a Schedule I substance, he argues, it cannot be an "analogue of fentanyl." Failing that, Williams asserts that the district court's definition of "analogue" renders the provision unconstitutionally vague.

We disagree. Briefly, the statute makes clear that a "controlled substance analogue" is a term of art quite different from the term "analogue of fentanyl," so we must instead simply look to the ordinary meaning of the word "analogue." There is nothing problematically vague about the definition that emerges as applied to furanyl fentanyl.

We also reject Williams's other challenges to his conviction and sentence. While he argues that the district court should have suppressed the evidence found inside the intercepted package, we find there was more than sufficient evidence to supply the reasonable suspicion required to seize it. And as to his procedural challenges to his sentence, we conclude that the district court made no errors requiring resentencing.

## I. Background

**A. Factual Background**

### 1. Intercepted Phone Calls

In February 2017, while detained in Georgia on narcotics charges, Millard Williams made a series of phone calls cryptically discussing the shipment of a package to Chicago. Homeland Security Investigations intercepted the calls, which we summarize below.

The calls began on February 23, with Williams contacting an individual named Willie Alexander. Williams informed Alexander that he would be receiving two "postcards or two letters" in the mail. In more phone conversations over the coming days, Williams told Alexander not to "do anything" with the letters without further instruction and warned him not to accept any late-coming mail—"especially from inter–, inter–, inter–, you know what I'm saying?" "It might be a trick," Williams cautioned, apparently in reference to delayed international shipments.

The mail arrived as Williams promised. On February 28, Alexander reported to Williams that his "thing was at the shop yesterday, the letters." Williams asked for "the last two digits on that"—apparently referring to the tracking number—to which Alexander responded, "83HK." Williams promised Alexander that someone would send him money if he forwarded the package to a "Maria Gonzalez," whose address Williams had previously provided. Once more, Williams stressed that delivery timing was key: "I'll be in contact with you so I know the date that it's supposed to arrive. It's very important that I know that. Or else, you know what I mean?" Williams then confirmed the spelling of

"Gonzalez" and the shipping address of "1008 North Springfield, Chicago … 60651."

On March 1, Williams called Michelle Jamison and Roland Black. He reported to them that he had "one cavalry" planned for "Maria Gonzalez" and instructed them to pick up the package from "Maria" after its arrival in Chicago.

That same day, Williams called Alexander and asked him how soon he could send the package, this time referring to its contents as "clothes." Alexander offered to do it the next morning. Williams then gave Alexander detailed marching orders for the next day: He was to go to the post office, pick out a box big enough to fit the "pants" and "shirts," take them out of their original packaging, put them in the box, and send everything "Priority Mail Express." Williams promised that he would have someone send Alexander money to cover the postage.

Later that day, Williams called Alexander again, this time with even more specific instructions:

> About my clothes … Especially the shoes…Take 'em out the box that they in … and wrap 'em up in some plastic or something so that they don't get scuffed….

> I got somebody that gon' send you the money today…. If you could send the clothes … like, tomorrow … before they close? … It's 'gon have a tracking number on it, right? Just send that back….

> Just do that for me. I really need those clothes and I don't want nobody to have 'em…. [I'll] call you tomorrow afternoon to make sure you picked up the money and everything…. Just make sure that it actually gets mailed tomorrow before 5:00…. Priority Mail Express.

As scheduled, on March 2 Alexander shipped from an Atlanta post office a package containing a bundle wrapped in clothing. He soon called Williams, reporting, "I just did it…. I wrapped it in some shirts."

**2. Intercepted Package**

In response to the February 28 phone call, Homeland Security Investigations instructed Chicago-based Postal Inspector Alexander Lupiani to seize any parcels headed to the 1008 North Springfield address. Lupiani soon learned of a package that fit the bill: a postal carrier had attempted delivery on March 3 of an express-mail package shipped from Atlanta. It was sitting at a post office in Chicago.

Lupiani went to the Chicago post office and inspected the package. While it did not have the "83HK" tracking number that Alexander had mentioned to Williams, it did have an Atlanta, Georgia, return address and was addressed to "Maria Gonzalez."

Lupiani seized the parcel, and law enforcement agents searched it the next day pursuant to a warrant. Inside, wrapped in a t-shirt placed in a garbage bag, they found two sealed packages of a white granular substance that tested as furanyl fentanyl, a Schedule I substance.

On March 9, law enforcement conducted a controlled delivery of the package, which now contained sham narcotics, a fluorescent tracing powder, and a beacon device to signal when the package was opened. A woman identifying herself as Maria Gonzalez (in fact named Janet Vazquez) accepted the package and took it inside.

Black called Jamison two minutes after the delivery. Jamison then called Williams, relaying "they got it."

A few minutes later, law enforcement received a signal that the package had been opened. They entered the building and Black fled. They found him hiding upstairs with the fluorescent tracing powder on his hands.

## B. Procedural Background

### 1. Indictment and Pretrial Motions

A grand jury indicted Williams—along with Black, Alexander, and Jamison—on violations of the Controlled Substances Act. Williams faced charges of conspiring to possess with intent to distribute 100 grams or more of a mixture or substance of furanyl fentanyl, an analogue of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846; possessing with intent to distribute a mixture or substance of furanyl fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and using the U.S. mail to further the conspiracy, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. Possession with intent to distribute at least 100 grams of a substance with a detectable amount of "any analogue of [fentanyl]" carries a mandatory minimum of ten years' imprisonment.[1] 21 U.S.C. § 841(b)(1)(A)(vi).

Williams moved to dismiss the conspiracy and possession counts, making the same argument then as now: that furanyl fentanyl is not an "analogue of fentanyl" within the meaning of § 841(b)(1)(A)(vi)'s penalty provision. Williams maintained that "analogue" for purposes of § 841(b)(1)(A)(vi) had the same meaning as "controlled substance analogue" under 21 U.S.C. § 802(32), which excludes scheduled substances. Since furanyl fentanyl was a scheduled substance, he contended it

---

[1] The statute uses the chemical name for fentanyl, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide. We simply call this "fentanyl."

could not be an "analogue of fentanyl" under § 841(b)(1)(A)(vi).

The district court denied the motion. It reasoned that the term "analogue of fentanyl" was distinct from the term "controlled substance analogue," so the statutory definition of the latter term did not control. Instead, the plain meaning of the word "analogue" led the court to conclude that an "analogue of fentanyl" is "any substance with a structurally similar chemical compound to fentanyl." The district court also rejected Williams's alternative argument that its construction rendered the phrase unconstitutionally vague, concluding that the statute provided fair notice because ordinary people would know that furanyl fentanyl is an analogue of fentanyl.

Williams separately moved to suppress the evidence discovered inside the package on the grounds that the government lacked the reasonable suspicion required to seize it. Specifically, he argued that the package's outward appearance was not suspicious and that agents had no knowledge at the time of the seizure of any shipping irregularities associated with it—for instance, knowledge that "Maria Gonzalez" did not exist, that the "83HK" tracking number referred to a shipping origin of Hong Kong, or that the listed recipients were not associated with their respective addresses. That knowledge, he asserted, came only after law enforcement had already seized the package—i.e., too late. He sought an evidentiary hearing to determine what law enforcement agents knew and did not know at the time of the seizure.

The district court denied the motion. It found that reasonable suspicion existed given Williams's history of importing narcotics from overseas, the content of the intercepted phone calls, and the discrepancies between the purported sender

and recipient and their listed addresses. The district court also denied the request for an evidentiary hearing, concluding that there were no disputed issues of fact material to its decision.

### 2. Trial, Jury Instructions, and Sentencing

Williams went to trial. At the end, the district court instructed the jury that a substance is an "analogue" of fentanyl if it "has a chemical structure that is substantially similar to the chemical structure of fentanyl." It rejected Williams's request to define the term as requiring both chemical and pharmacological similarity between fentanyl and the substance at issue. The jury convicted Williams on all counts.

The district court sentenced Williams to 210 months' imprisonment. In explaining the sentence, the court rejected Williams's claim that his conduct was nonviolent. Perhaps it was not physically violent, the court acknowledged, but it nonetheless involved violence of another kind, given the singular lethality of fentanyl-laced drugs, their devastating impact on communities, and the fact that Williams's co-defendants feared him and feared violence from him.

The court also addressed Williams's argument that his nonviolent criminal history produced an outsized sentencing range compared to that of Black, his co-defendant, who had a conviction for first-degree murder. The court observed that Williams had an "astounding" 25 convictions of his own, from which it reasoned Williams had failed to learn his lesson. In fact, Williams had 21 prior convictions.

*        *        *

Williams now appeals both his conviction and sentence. His arguments fall into three categories: a statutory challenge to his conviction, an evidentiary challenge relating to his

motion to suppress, and a procedural challenge concerning the district court's remarks at sentencing. We take each in turn.

### II. 21 U.S.C. § 841(b)(1)(A)(vi): "Analogue of Fentanyl"

The Controlled Substances Act of 1971 ("CSA") makes it unlawful to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a). The Act defines "controlled substance" as a "drug or other substance" listed in one of the five schedules. *See id.* § 802(6). The schedules, in turn, categorize "controlled substance[s]" according to their potential for abuse and accepted medical use. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425 (2006). The most dangerous are listed in Schedule I and the least dangerous appear in Schedule V. *See* 21 U.S.C. § 812. Furanyl fentanyl—the substance at issue here—is listed in Schedule I. *See* Schedules of Controlled Substances: Temporary Placement of Furanyl Fentanyl Into Schedule I, 81 Fed. Reg. 85873 (Nov. 29, 2016) (codified at 21 C.F.R. pt. 1308); Schedules of Controlled Substances: Placement of Furanyl Fentanyl, 4-Fluoroisobutyryl Fentanyl, Acryl Fentanyl, Tetrahydrofuranyl Fentanyl, and Ocefentanil in Schedule I, 83 Fed. Reg. 61320 (Nov. 29, 2018) (codified at 21 C.F.R. pt. 1308).

In 1986, Congress amended the CSA through the Anti-Drug Abuse Act in an attempt to head off the burgeoning "designer drug" industry, in which scientists "slightly modif[ied] the chemical structure of banned drugs to create new 'designer drugs' that would have similar physiological effects but would not be covered by the law's controlled substances schedule." *United States v. Turcotte*, 405 F.3d 515, 523 (7th Cir.

2005); 21 U.S.C. § 802(32)(A)(i)–(iii). This amendment, often called the Analogue Act, introduced and subjected to regulation "controlled substance analogue[s]," which it treats as Schedule I substances for purposes of federal law. 21 U.S.C. § 813. The Analogue Act defines a "controlled substance analogue" as a substance:

   (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

   (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

   (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

*Id.* § 802(32)(A). The definition specifically excludes substances already listed in one of the schedules. *See id.* § 802(32)(C)(i).

The Anti-Drug Abuse Act also establishes enhanced penalties for violations of the CSA involving fentanyl and fentanyl analogues. *See id.* § 841(b)(1)(A)(vi), (B)(vi). Relevant here, it imposes a ten-year mandatory minimum sentence for offenses involving "400 grams or more of a mixture or

substance containing a detectable amount of" fentanyl or "100 grams or more of a mixture or substance containing a detectable amount of any analogue of" fentanyl. *See id.* § 841(b)(1)(A)(vi). The Analogue Act does not define the terms "analogue" or "analogue of fentanyl."

## A. The Meaning of "Analogue of Fentanyl"

In the absence of a statutory definition, Williams contends that "analogue" in the phrase "analogue of fentanyl" takes its meaning from "controlled substance analogue" under § 802(32) of the CSA. A "controlled substance analogue" cannot be an already-scheduled substance. *See id.* § 802(32)(C)(i). So, because furanyl fentanyl is a scheduled substance, Williams asserts, it does not qualify as a "controlled substance analogue" and therefore cannot be an "analogue of fentanyl" for purposes of § 841(b)(1)(A)(vi). In the alternative, he argues that the definition the district court adopted here renders the statute unconstitutionally vague as applied to him, and he asks us to construe the statute in his favor under the rule of lenity. We review these questions of statutory interpretation de novo. *See United States v. Betts*, 99 F.4th 1048, 1058 (7th Cir. 2024).

### 1. The Statutory Definition for "Controlled Substance Analogue" in § 802(32) Does Not Control

While our review is de novo, we do not hear the issue on a blank slate. We considered the precise argument—that § 802(32)'s statutory test for a "controlled substance analogue" applies to "analogue[s] of fentanyl" under § 841(b)(1)(A)(vi)—and rejected it in *United States v. Johnson*, 47 F.4th 535 (7th Cir. 2022). The problem with that position, we concluded, was that "controlled substance analogue"

under the CSA is a term of art separate and distinct from the terms "analogue," or "analogue of fentanyl." *Id.* at 543. Section 802(32) therefore had no bearing on the meaning of § 841(b)(1)(A)(vi)'s penalty provision. *Id.*

Williams argues that *Johnson* is not dispositive because we decided that case under plain error review. *See, e.g.*, *United States v. Canfield*, 2 F.4th 622, 626 (7th Cir. 2021) ("Although we generally review statutory interpretation questions de novo, a challenge not raised before the district court is, at best, reviewed for plain error." (citations omitted)). True, *Johnson* arose under a more lenient standard. But it tackled the issues thoroughly and persuasively. We therefore have every reason to follow it here.

While Congress did not define the term "analogue of fentanyl" for purposes of § 841(b)(1)(A)(vi), it did define "controlled substance analogue" in 21 U.S.C. § 802(32). As we explained in *Johnson*, however, the statute leaves unignorable clues that Congress understood "controlled substance analogue" to mean something different from "analogue."

Congress used the full term "controlled substance analogue" elsewhere in the statute, including in other penalty provisions. The term appears in provisions prescribing penalties for distributing a "controlled substance or controlled substance analogue" with the intent to commit a crime of violence, 21 U.S.C. § 841(b)(7)(A), and for "providing … a controlled substance or a controlled substance analogue" to any person under eighteen years of age, 21 U.S.C. § 861(d)(1). Congress also used it in discussing a particular controlled substance, defining the term "date rape drug" as "[GHB] or any controlled substance analogue of GHB." *Id.* § 841(g)(2)(A)(i). But Congress did not do the same in the

fentanyl penalty provision at issue here. As we recognized in *Johnson*, a surefire way for Congress to signal that two terms mean different things is for it to use one term in one place and the other elsewhere. 47 F.4th at 543; *see also Russello v. United States*, 464 U.S. 16, 23 (1983).

Williams says we should not read too much into the latter provision defining "date rape drug" because Congress passed it twenty years after enacting the Analogue Act containing the fentanyl penalty provision at issue. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Even so, that still leaves Congress's use of the term in the other penalty provisions. So the fact remains that Congress declined to use the full term "controlled substance analogue" in the fentanyl penalty provision, despite defining that term and employing it twice elsewhere in the same legislation. Moreover, we find it at least informative that the later amendment was consistent with Congress's already established practice of using "controlled substance analogue" as a term of art. Our conclusion in *Johnson* stands: "controlled substance analogue" is different from "analogue of fentanyl."

The plain meaning of the text means our analysis could end there, notwithstanding the parties' sparring over the meaning of the legislative tea leaves. *See Preston v. Midland Credit Mgmt., Inc.*, 948 F.3d 772, 783 (7th Cir. 2020) ("[When] the statutory language neither leads to absurd results nor is ambiguous, resort to legislative history is neither necessary nor appropriate.") (citing *United States v. Silva*, 140 F.3d 1098, 1102 (7th Cir. 1998)). These arguments are unconvincing anyways.

For example, Williams says his reading offers the "escape valve" that Congress meant to provide by "giving the

Attorney General the power to exempt less dangerous ana-
logues from [harsh] punishments by listing them as sched-
uled substances." Yet there is no evidence Congress contem-
plated such a substance in passing § 841(b)(1)(A)(vi). The idea
that Congress was leaving room for a less terrible fentanyl an-
alogue is at odds with the very existence and structure of the
penalty provision, too. Section 841(b)(1)(A)(vi) punishes
lesser amounts of fentanyl analogues just as seriously as it
punishes greater amounts of ordinary fentanyl—requiring
400 grams or more of fentanyl, but only 100 grams or more of
an analogue of fentanyl, to trigger the mandatory minimum.
Reading the statute as Williams wishes would lead to the ab-
surd result of preventing the DEA from recognizing more
dangerous fentanyl analogues by placing them in Schedule I
while still allowing for their possession to be punished with
the commensurate severity under the penalty provision. We
doubt Congress intended such a backwards outcome. *See
Senne v. Vill. of Palatine*, 784 F.3d 444, 447 (7th Cir. 2015)
("[S]tatutes have to be interpreted to avoid absurd results.").

    No circuit court has held otherwise. In fact, the only other
court of appeals to consider whether "analogue of fentanyl"
differs from "controlled substance analogue" agrees with us.
The Second Circuit rejected an identical argument in *United
States v. McCray*, 7 F.4th 40, 46 (2d Cir. 2021), with respect to
butyryl fentanyl, ultimately concluding that "where that spe-
cialized term ['controlled substance analogue'] does not ap-
pear, we have no reason to apply its specialized definition."
As we observed in *Johnson*, the reasoning in *McCray*, which
closely tracks ours today, is persuasive. *Johnson*, 47 F.4th at
543.

### 2. The Ordinary Meaning of the Term Applies

Since the statutory definition of "controlled substance analogue" does not control the meaning of "analogue of fentanyl," and since the statute otherwise leaves "analogue of fentanyl" undefined, we must give the term its ordinary meaning. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011); *see also Chapman v. United States*, 500 U.S. 453, 461–62 (1991) (giving undefined terms in the CSA their ordinary meanings). This task leads us to reach for a familiar toolkit: we look to dictionary definitions and "sometimes … the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted." *Johnson*, 47 F.4th at 543 (citing *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015); *Chapman*, 500 U.S. at 462). Additionally, "[w]hen words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023).

In the chemistry context, dictionaries define "analogue" as a "chemical compound structurally similar to another but differing often by a single element." *Analogue*, Webster's Medical Desk Dictionary (1st ed. 1986); *see also Analog*, American Heritage Dictionary (2d ed. 1982) ("A structural derivative of a parent compound."); *Analogue*, Taber's Cyclopedic Medical Dictionary (15th ed. 1985) ("In chemistry and pharmacology, a compound structurally similar to another."); *Analogue*, Mosby's Medical Dictionary (2d ed. 1986) ("[A] drug or other chemical compound that resembles another in structure or constituents but has different effects."); *Analogue*, Stedman's Medical Dictionary (5th ed. 1982) ("A compound that resembles another in structure; may be an isomer, but not necessarily."). In line with these definitions, we find that the district court here correctly instructed the jury that a substance is an

"analogue" of fentanyl if it has a chemical structure that is substantially similar to the chemical structure of fentanyl.

While Williams does not dispute that furanyl fentanyl fits that definition, he argues the district court's definition was incomplete. According to him, "analogue," must encompass both structural *and* functional similarity—that is, the drug must look chemically similar and have a similar effect on the body. Yet as the definitions above illustrate, the ordinary meaning of analogue contemplates merely structural, or chemical, similarity. Moreover, Williams relies on the definition of "controlled substance analogue" in § 802(32)(A) for this argument. As we have determined, a "controlled substance analogue" is different from an "analogue of fentanyl." Borrowing from its definition makes little sense because it would betray Congress's choice *not* to employ that term of art in § 841(b)(1)(A)(vi). *See McCray*, 7 F.4th at 47 n.4.

Williams also faults the district court's use of the word "substantially." It is an odd fight to pick given that requiring substantial similarity increased, rather than decreased, the government's burden of proof at trial. In any event, a "substantial" similarity requirement accurately reflects the ordinary meaning of the word "analogue" because it accounts for the high degree of chemical or structural closeness required for one compound to be the analogue of another. *See, e.g., Analogue*, Webster's Medical Desk Dictionary ("[A] chemical compound structurally similar to another but differing often by a *single element* of the same valence and group of the periodic table as the element it replaces." (emphasis added)); *Analog*, McGraw-Hill Dictionary of Scientific and Technical Terms (1st ed. 1974) ("A compound whose structure is similar to that of another compound but whose composition differs

by one element."). We thus conclude that the district court did not err in instructing the jury on the meaning of "analogue of fentanyl."

**B. Vagueness**

Williams also contends that giving "analogue" its ordinary meaning renders the statute unconstitutionally vague as applied to him. There is no principled way to figure out how one chemical compound is "substantially similar" in structure to another, he argues, leaving him without notice of which drugs trigger § 841(b)(1)(A)(vi)'s penalties. We consider this claim de novo. *United States v. Pacilio*, 85 F.4th 450, 458 (7th Cir. 2023).

A criminal statute violates the Fifth Amendment's Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Waldrip*, 859 F.3d 446, 450 (7th Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). In the context of an as-applied challenge, the litigant "must show that it is vague as applied to him; and if the statute undoubtedly applies to his conduct, he will not be heard to argue that the statute is vague as to one or more hypothetical scenarios."[2] *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020).

---

[2] The government invokes *Chapman v. United States* to argue that sentencing provisions like § 841(b)(1)(A)(vi) are more resistant to vagueness challenges than criminal laws. 500 U.S. at 467–68 (concluding that a vagueness challenge was "particularly" weak "since whatever debate there is would center around the appropriate sentence and not the criminality of the conduct"); *see also Johnson*, 576 U.S. at 630 (Alito, J., dissenting)

We reject Williams's vagueness challenge to
§ 841(b)(1)(A)(vi) as applied to furanyl fentanyl. Admittedly,
determining whether one substance is "substantially similar"
to another in chemical structure is a subjective assessment
susceptible to some amount of imprecision. *See United States
v. Makkar*, 810 F.3d 1139, 1143 (10th Cir. 2015) ("It's an open
question, after all, what exactly it means for chemicals to have
a 'substantially similar' chemical structure—or effect."). This
shortcoming, however, is inherent in myriad legal standards
and does not by itself render the statute impermissibly vague
as applied to furanyl fentanyl. Time and again courts have
stressed that qualitative language alone does not make a stat-
ute void for vagueness, especially when, as here, "the statute
under scrutiny calls upon the court to apply that standard to
a concrete set of facts." *Cook*, 970 F.3d at 875 (citing *Johnson*,
576 U.S. 591); *see also Sessions v. Dimaya*, 584 U.S. 148, 161
(2018) ("[T]he point is not that such a non-numeric standard
is alone problematic."); *Ill. One News, Inc. v. City of Marshall*,

---

(arguing that "[t]he bar [for vagueness challenges] is even higher for sen-
tencing provisions"). But more recently, a majority of the Court has made
clear that the Fifth Amendment's strictures apply "not only to statutes de-
fining elements of crimes, but also to statutes fixing sentences." *Johnson*,
576 U.S. at 596; *see also Beckles v. United States*, 580 U.S. 256, 262 (2017) (dis-
cussing *Johnson*); *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So
too, vague sentencing provisions may pose constitutional questions if they
do not state with sufficient clarity the consequences of violating a given
criminal statute."). We follow *Johnson*'s approach in this Circuit and rou-
tinely review penalty provisions, including penalty provisions of the CSA,
for vagueness without reference to a heightened standard. *See, e.g., United
States v. Vivas-Ceja*, 808 F.3d 719, 721 (7th Cir. 2015); *Waldrip*, 859 F.3d at
450–51 (considering vagueness challenge to 21 U.S.C. § 841(b)(1)(C)).

477 F.3d 461, 465 (7th Cir. 2007) ("It is all but impossible to write a law or regulation without some qualitative words such as 'substantial,' and these do not automatically prevent enforcement."). Such was the case here, where the court asked the jury to compare the chemical structures of two compounds, evaluate the government's expert testimony describing them, and determine whether they were sufficiently alike. *See United States v. Galecki*, 89 F.4th 713, 732 (9th Cir. 2023) ("Defendants are simply wrong in contending that vagueness doctrine precludes Congress from ever drawing legal lines that take account of the complexities of the underling subject matter being regulated.").

Indeed, this court and every other appellate court has rejected vagueness challenges to the same "substantially similar" language in § 802(32)(A). *See, e.g., Turcotte*, 405 F.3d at 531–32 (collecting cases); *Galecki*, 89 F.4th at 730; *United States v. Palmer*, 917 F.3d 1035, 1038 (8th Cir. 2019); *United States v. Demott*, 906 F.3d 231, 237 (2d Cir. 2018); *cf. McFadden v. United States*, 576 U.S. 186, 197 (2015) (rejecting the contention "that the substantial similarity test for defining analogues is itself indeterminate"). Williams seeks to distinguish these cases on the ground that § 802(32)(A) has the additional requirement of pharmacological, or functional, similarity. *See, e.g., United States v. Washam*, 312 F.3d 926, 933 (8th Cir. 2002) (noting that the dual requirement of showing structural *and* pharmacological similarity "prevents arbitrary enforcement"). But this court's decision in *Turcotte* finding the phrase not vague in the context of § 802(32)(A) did not even mention, let alone hang its hat on, that difference. 405 F.3d at 531–33. As we said there, even though there is no scientific definition of the phrase "substantially similar" as applied to questions of molecular

chemistry, the language of the provision is "sufficiently clear by its own terms." *Id.* at 531.

Furthermore, the inevitable uncertainty of non-numerical standards "often is offset by notice." *United States v. Caputo*, 517 F.3d 935, 941 (7th Cir. 2008). Such is the case here. Furanyl fentanyl is among the four most common fentanyl analogues. *See* United States Sentencing Commission, Fentanyl and Fentanyl Analogues: Federal Trends and Trafficking Patterns 22 (2021); Vivek Velagapudi & Roopa Sethi, *Illicit Non-Pharmaceutical Fentanyl and its Analogues: A Short Review of Literature*, 16 Kans. J. Med. 25–27 (2023). The DEA first listed furanyl fentanyl as a Schedule I substance in 2016 and in doing so explicitly described the substance as a "fentanyl analogue." 81 Fed. Reg. at 85875. It is hard to think Williams was left guessing whether furanyl fentanyl was an analogue of fentanyl under these circumstances. *See Turcotte*, 405 F.3d at 533 (rejecting as-applied vagueness challenge as to GBL, finding it "difficult indeed to claim that Turcotte lacked notice as to the chemical similarities of GBL and GHB" given that DEA regulations had stated that GBL was structurally similar to GHB); *United States v. Fisher*, 289 F.3d 1329, 1335–36 (11th Cir. 2002) (same, finding it relevant that GBL was a listed chemical and that Congress had stated that GBL was a chemical analogue to GHB); *Washam*, 312 F.3d at 931 (same for 1,4-Butanediol).

Williams's concern that the "substantial similarity" test leaves § 841(b)(1)(A)(vi) susceptible to arbitrary enforcement is similarly unfounded. The DEA has made clear that furanyl fentanyl, like all fentanyl analogues, is an illegal analogue of fentanyl, the control of which is necessary to avoid imminent hazard to public safety. 81 Fed. Reg. at 85874. Giving the government discretion to aggressively prosecute its possession by

seeking an enhanced statutory penalty "is an integral feature of the criminal justice system" and does not render the provision vague. *United States v. LaBonte*, 520 U.S. 751, 762 (1997); *cf. United States v. Syms*, 846 F.3d 230, 233–34 (7th Cir. 2017) (rejecting the argument that prosecutorial discretion in pursuing statutory mandatory minimum charges violates the separation of powers doctrine). Accordingly, we do not find the district court's jury instruction regarding "analogue" requiring a substantially similar chemical structure vague.

## C. Lenity

Finally, Williams invokes the rule of lenity and asks us to resolve any doubt about the meaning of the statute in his favor. Lenity, however, comes into play only when we find a statute suffers from a "grievous ambiguity or uncertainty." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016). It therefore has no place here, where the meaning of the statute is clear.

## III. Motion to Suppress

We turn next to Williams's argument concerning the district court's denial of his motion to suppress the evidence discovered in the seized package. He asks us to reverse the district court's decision, or, in the alternative, to remand for an evidentiary hearing. We "employ[] a dual standard of review for motions to suppress evidence: we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022) (citing *United States v. Chang*, 999 F.3d 1059, 1065 (7th Cir. 2021)). We review the denial of an evidentiary hearing on a motion to suppress for an abuse of discretion. *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018).

The Fourth Amendment's guarantee against unreasonable searches and seizures extends to sealed packages sent through the mail. *United States v. Pitts*, 322 F.3d 449, 454 (7th Cir. 2003). Law enforcement agents must therefore have reasonable suspicion that a package contains contraband before detaining it for a reasonable length of time to investigate. *United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003).

Reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch." *Id.* (citing *United States v. Ward*, 144 F.3d 1024, 1034 (7th Cir. 1998)). Still, it is "less than probable cause." *United States v. Shaffers*, 22 F.4th 655, 659 (7th Cir. 2022). We consider the totality of law enforcement's knowledge at the time of the seizure and ask whether a "particularized and objective basis" justified it. *Navarette v. California*, 572 U.S. 393, 396–97 (2014); *Ganser*, 315 F.3d at 843. The existence or absence of reasonable suspicion is a question of law on which we owe the district court no deference. *See United States v. Flores*, 798 F.3d 645, 648 (7th Cir. 2015).

Williams's position is that the district court erred in concluding that law enforcement knew at the time of the seizure that the package originated internationally and that the sender and recipient listed on the packages were not associated with their respective addresses. But even accepting that as true, the information undisputedly known to law enforcement—the combination of Williams's February 28 phone conversation coupled with his criminal history of engaging in nearly identical conduct—was more than enough to provide reasonable suspicion to believe that the package was part of an orchestrated shipment of narcotics.

It is undisputed that a government agent had listened to the February 28 phone call between Williams and Alexander.

That call was suspicious. After Alexander reported that he had received Williams's "letters" in the "shop," Williams asked for the tracking number and then issued detailed instructions to forward the contents to a specific address in Chicago in exchange for payment. Williams did all this with an anxious fixation on the time-sensitive nature of the delivery, emphasizing to Alexander that it was "very important" that he know the parcel's expected delivery date, "or else."

Fishy enough standing alone, these facts also fit to a tee the profile of Williams's extensive prior criminal activity. At the time of the calls here, Williams was in jail on charges for nearly identical conduct: using emissaries to receive international shipments of narcotics. Specifically, law enforcement had intercepted international parcels nominally addressed to Williams's associates and containing pills of MDMA, commonly known as ecstasy, on three separate occasions. During the one-month period in which Williams was in state custody relating to that conduct, law enforcement recorded him repeatedly calling associates to organize more drug shipments. Williams had in fact ordered drugs from international sources as recently as February 2017, leading to his eventual arrest on February 21. And on the day of his arrest, law enforcement found heroin, oxycodone, and drug paraphernalia in his apartment.

A *modus operandi* emerges: Williams had a practice of importing narcotics through the mail and a track record of making it all happen from within a jail cell. This kind of criminal history can support reasonable suspicion—especially when, as here, it is a near perfect match to the suspicious conduct in question. *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir.

2019); *see also United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005).

But did law enforcement have reasonable suspicion to seize *that* package in particular? Yes. The package was addressed to the same address, 1008 North Springfield, and the same recipient, Maria Gonzalez, as Williams had instructed over the phone. And it was sent from Atlanta, the same city where Williams and been arrested and where Alexander had told him that his "thing" was in the "shop." Moreover, the package had been shipped on March 2, just days after Williams had urged Alexander to forward the "letters" on to Chicago. And while Williams complains that law enforcement had inappropriately resolved to seize *all* the packages headed for 1008 North Springfield, the record shows that law enforcement detained only one package—a package they had reasonable suspicion to seize. *See United States v. Black*, 2024 WL 3058266, at *3 (7th Cir. 2024) (reaching the same conclusion as to Williams's co-defendant).

Because reasonable suspicion to seize the package existed based on the February 28 phone call and Williams's prior criminal activity, we need not consider whether the district court made erroneous factual findings. Equally unnecessary is an evidentiary hearing, which is required to suss out the facts only when "a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Cade*, 93 F.4th 1056, 1063 (7th Cir. 2024) (quoting *Edgeworth*, 889 F.3d at 353). The disputed issues here were not outcome-determinative, so the district court did not abuse its discretion by denying a hearing.

We therefore affirm the district court's denial of the motion to suppress.

### IV. Sentencing Remarks

Williams's final two arguments concern statements the district court made at his sentencing hearing, which he says amount to procedural error. He first argues that the district court improperly found that Williams's co-defendants were afraid of him. He also contends that the district court relied on a misunderstanding of his number of past criminal convictions when deciding his sentence.

Criminal sentences must be based on accurate and reliable, rather than speculative, information, *see United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009), and we consider each alleged error in turn. But first a note on the proper standard of review. Williams conceded that plain error review applied to his challenges since he did not contemporaneously object to these statements at sentencing. It was an unnecessary defeat, however, because Williams was entitled to de novo review. Both alleged misstatements came in the district court's explanation of its sentence, objections to which are unnecessary for preservation purposes. *See United States v. Wood*, 31 F.4th 593, 597 (7th Cir. 2022) ("A district court's explanation of its sentencing decision, regardless of whether it precedes or follows the announcement of the sentence itself, is a ruling to which an exception is not required."); *United States v. Wilcher*, 91 F.4th 864, 870 (7th Cir. 2024). In any event, for the reasons explained below, the standard of review makes no difference here. Even under de novo review we find no error.

### A. Alleged Speculation About Co-conspirators' Fear

At sentencing, Williams argued in mitigation that his crime was nonviolent. The district court rejected that characterization in discussing the nature and circumstances of the

offense. *See* 18 U.S.C. § 3553(a)(1). The court reasoned that fentanyl substances, while perhaps not weapons of physical violence, inflict their own kind violence on communities, akin to "having a gun."

The court also reflected on what it perceived as the violent undertones of the relationships between Williams and his co-conspirators. It stated:

> [W]hen you talk about no violence, I look at the fear that I heard in people's voices who were on the tapes with you. The fear that I saw on the faces of your co-defendants, even Mr. Roland. When they talked about you, there was fear when they were talking about you or what you said or what you did. Those people did what you said because they were afraid of you. So when you say there was no violence, there's definitely a fear of violence. And this Court has to take all that into consideration when I look at the nature and circumstances of this offense....

> [T]he fear that was on the people's faces and in their voices. How you could be in jail, locked up, and they still knew they better do what you said. And that was even amazing to me the way that people would jump, how high. And you were in custody, and they were still afraid of you. So there was something behind that that was enough violence to make people do that.

The court's statement was not the kind of unfounded speculation that offends due process. The court knew that Williams was capable of violence, as he had a history of arrests for assault, battery, and domestic violence. From that starting place, we must defer to the district court's appraisal of how

Williams's co-defendants perceived him. *See United States v. Major*, 33 F.4th 370, 380 (7th Cir. 2022) ("[W]here a sentencing challenge boils down to a credibility decision, … our review is especially deferential to the district judge's assessment of the testimony." (quoting *United States v. Etchin*, 614 F.3d 726, 738 (7th Cir. 2010)); *United States v. Warner*, 792 F.3d 847, 858 (7th Cir. 2015); *United States v. Pulley*, 601 F.3d 660, 664 (7th Cir. 2010) (noting that a district court's determination of witness credibility "can virtually never be clear error"). And contrary to Williams's claim, the district court had the opportunity to do so: it presided over the cases of his co-defendants, which included a separate trial for Black. The court had seen these co-defendants in person, heard their voices on recorded calls with Williams, and observed their obedience in response to his instructions. We will not second-guess its assessment of the relationship between Williams and his co-conspirators on these facts.

**B. Misstatement of Criminal History**

The district court subsequently commented on Williams's recidivism. It observed that Williams had an "astounding" 25 prior convictions. In fact, he had 21.

Factual errors in a district court's explanation of its sentence can "easily" require remand for resentencing where there exists the possibility that "the inaccurate information mattered in the sentencing." *United States v. Pennington*, 908 F.3d 234, 240 (7th Cir. 2018); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). "For false information to form part of the basis for a sentence, the defendant must show 'first, that information before the sentencing court was inaccurate, and second, that the sentencing court relied on the misinformation in passing sentence.'" *United States v. Propst*, 959 F.3d 298, 304

(7th Cir. 2020) (quoting *United States ex rel. Welch v. Lane*, 738 F.2d 863, 864 (7th Cir. 1984)). Showing reliance is a low bar that does not require showing prejudice: we ask only whether the false information was "part of the basis for the sentence." *United States v. Miller*, 900 F.3d 509, 513 (7th Cir. 2018) (quoting *Lane*, 738 F.2d at 865). Actual reliance on misinformation occurs, for example, "if the court gives explicit attention to it, founds its sentence at least in part on it, or gives specific consideration to the misinformation before imposing [the] sentence." *Id.* (quoting *United States v. Chatman*, 805 F.3d 840, 844 (7th Cir. 2015)).

Although the district court here undoubtedly misspoke, it did not actually rely on its inaccurate tally. Viewing the statement as it appeared within the sentencing as a whole illustrates why. *See United States v. Corona-Gonzalez*, 628 F.3d 336, 342 (7th Cir. 2010) ("Context plays a crucial role in evaluating the degree of influence that an unsupported fact has had on a district court's sentencing decision.").

Before and at sentencing, Williams argued that relying on his criminal history in calculating his Guidelines range produced an unreasonable sentence. Specifically, he pointed out that Black, his co-defendant, had served a fourteen-year sentence for first-degree murder, yet had fewer criminal history points and thus a lower Guidelines range. Williams argued that his past transgressions were comparatively minor and nonviolent, yet he faced 360 months to life imprisonment. The district court was unpersuaded:

> I know there's references to Mr. Black's 14 years, whatever he did for that very serious crime he committed at a much younger age, you know. But you have not had to do anywhere near that time for all of the issues that

you have caused over the years. 25 arrests, was it? 25 convictions for various things that you didn't have to do a lot of time on. But that's just astounding.

You never learned your lesson, clearly. You just learned how to break the rules and be able to maybe do it better by connecting phone calls and hooking up other people with the kind of telephone systems we have now. That's what you seemed to have learned.

The court's complete discussion shows this is a case in which a misstatement—the precise number of Williams's convictions—gets swallowed by the broader point—Williams's recidivism—on which the court actually relied. In *United States v. Chatman*, for example, the government said at sentencing that the defendant had "several" DUI convictions and "several" convictions for drug possession, when in fact he had only two of each. 805 F.3d at 842. We held that the district court did not actually rely on those alleged overstatements in determining the sentence. *Id.* at 844. Instead, we found that the real driving factor behind the court's sentence was "the larger context" of the defendant's "extensive criminal and substance abuse history." *Id.* at 844–45. That larger context "subsumed" the government's factual error. *Id.* at 845; *see also United States v. Hendrix*, 74 F.4th 859, 870 (7th Cir. 2023) (finding no error where the district court made allegedly inaccurate assertions about gun violence because it was the "overarching reality" that "gun violence is a serious problem in Chicago, … rather than any particular data point, that drove the court").

The same goes here. The court's focus, and its point of reliance, was on Williams's penchant for recidivism, not his precise number of convictions. As evidenced by the fact that the

district court initially framed its conviction count as a question, the district court was less concerned with getting the number precisely right than it was with highlighting the sheer volume of Williams's criminal conduct and the troubling trend it represented. The slight miscount along the way does not amount to a procedural error where, as here, Williams's criminal record was long and highlighting that fact was the purpose of the court's statement. *See, e.g.*, *Propst*, 959 F.3d at 304–05 (finding no reliance on the court's misstatement of the number of similar convictions in the absence of evidence that misinformation influenced or affected the sentence); *United States v. White*, 2022 WL 16849062, at \*2 (7th Cir. 2022) (same where the court misstated the length of the defendant's prior employment, but its "focus was on the temporary nature of his jobs … rather than a specific length of any job").

Other contextual clues underscore our conclusion that the district court did not rely on the inaccurate statement in fashioning its sentence. First, the district court made no mistakes when it crunched the numbers and calculated Williams's Guidelines range earlier at the sentencing hearing. It correctly stated that Williams had 40 criminal history points and a criminal history category of VI "based on the number of convictions [he] had," and then it properly calculated a Guidelines range of 360 months to life. This is therefore not a case in which the district court's single incorrect comment "reveals that the judge misapprehended the record." *Miller*, 900 F.3d at 514. Second, the district court ultimately ditched the 360-months-to-life Guidelines range and imposed a far more lenient sentence of 210 months. Were the specific number of prior convictions influencing the district court's sentence, varying downward from the Guidelines range those convictions produced would be an odd way to express that influence.

The court's focus on Williams's recidivism generally as opposed to his precise number of convictions makes this case different from *United States v. Durham*, 645 F.3d 883 (7th Cir. 2011) and *Townsend v. Burke*, 334 U.S. 736 (1948), on which he relies. Moreover, both of those cases involved the district court completely fabricating *specific* criminal conduct that had never occurred. *See Durham*, 645 F.3d at 899–900 (finding plain error where the district court stated that the defendant had committed prior gun offenses, when the defendant had no prior convictions involving firearms); *Townsend*, 334 U.S. at 740 (finding error where the district court emphasized multiple offenses for which he had "been found not guilty").

In sum, because the district court did not rely on its inaccurate recitation of Williams's criminal history, it committed no error that would entitle Williams to resentencing.

### V. Conclusion

For these reasons, Williams's conviction and sentence are

AFFIRMED.